**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SENAQU THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-4410 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| and MARLENE HENZE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Senaqu Thomas had some health problems while incarcerated at Stateville Correctional Center. He suffered from several gastrointestinal issues, including osmotic diarrhea and an infection by a stomach bacteria called *h. pylori*. Thomas needed medical care. And he got it, in spades.

Thomas received treatment at Stateville from Marlene Henze, a licensed medical doctor. Henze worked for Wexford Health Sources, the company responsible for providing medical care for the inmates. Thomas also received regular treatment from the gastroenterology service at the University of Illinois at Chicago.

Thomas takes issue with the quality of care that he received. So he filed suit against Henze and Wexford, alleging that they showed deliberate indifference to his medical problems. After discovery, Defendants moved for summary judgment.

For the following reasons, Defendants' motion for summary judgment is granted.

**Non-Compliance with the Local Rules**

Before diving in, this Court must address Thomas's failure to comply with the Local Rules when it comes to the record. The punchline is that Defendants complied with the Local Rules, but Thomas did not. So all of Defendants' facts are deemed admitted.

Local Rule 56.1 establishes the procedure for filing and opposing a motion for summary judgment. The moving party must provide a "statement of material facts that complies with LR 56.1(d) and that attaches the cited evidentiary material." *See* L.R. 56.1(a)(2). That statement of facts must rest on evidence in the record, with user-friendly citations. "Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." *See* L.R. 56.1(d)(2).

In response to a statement of facts, the opposing party must file (1) a memorandum of law; and (2) a response to the movant's "LR 56.1(a)(2) statement of material facts that complies with LR 56.1(e)[.]" *See* L.R. 56.1(b)(2). The response to the movant's statement of facts must "consist of numbered paragraphs corresponding to the numbered paragraphs" in the movant's statement of facts. *See* L.R. 56.1(e)(1).

Basically, the Local Rules require the non-movant to respond, paragraph by paragraph, to the facts in the movant's statement of facts. And if the non-movant disagrees with any of the movant's facts, the non-movant must cite evidence in the record to back up its position.

The Local Rules also allow the non-moving party to add facts to the record by filing a statement of additional material facts. *See* L.R. 56.1(b)(3). The process for a statement of additional facts is basically the same as the process for a statement of facts.

Wexford and Henze complied with Local Rule 56.1 by filing a statement of facts in support of their motion for summary judgment. *See* Defs.' Statement of Facts (Dckt. No. 110). So far, so good.

In response, Thomas did nothing. Thomas did not file a response to Defendants' statement of facts. A failure to respond to a statement of facts has straightforward consequences. "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *See* L.R. 56.1(e)(3).

Thomas also did not file a statement of additional facts. So he didn't put any facts of his own into record.

Basically, Thomas didn't file anything. He didn't respond to Defendants' statement of facts, and he didn't offer his own statement of additional facts.

Summary judgment is the put-up-or-shut-up, smoke-'em-if-you-got-'em, speak-now-or-forever-hold-your-peace time. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999). Now's the time to put your cards on the table.

The rules exist for good reason. Parties must present the record to the district court in a clear, digestible, orderly fashion so that the district court can look at the evidence and ferret out whether there are genuine issues of material fact. A district court must figure out if there is any *there* there. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact.").

The upshot is simple. Defendants put facts in the record, and supported them with admissible evidence. Thomas didn't respond, so all of Defendants' facts are deemed admitted. Thomas didn't put any additional facts into the record, either.

All of this is a long way of saying a simple point. The record consists of the facts put forward by Defendants in their statement of facts, and nothing else.

## Background

Senaqu Thomas was incarcerated at Stateville Correctional Center from 2014 to September 2021. *See* Defs.' Statement of Facts, at ¶ 3 (Dckt. No. 110). Wexford Health Sources, Inc. provides medical care to inmates at Stateville. *Id.* at ¶ 5. Marlene Henze worked at Stateville as a medical doctor from October 2018 to December 2023. *Id.* at ¶ 4.

In October 2016, Thomas began complaining about gastrointestinal issues to medical personnel at Stateville. *Id.* at ¶ 7. At first, he complained about constipation to a nurse. *Id.* From October 2016 to December 2018, Thomas received medical treatment multiple times. *Id.* at ¶ 8. He received antibiotics, laxatives, and antidiarrheal medications. *Id.* at ¶ 8. Thomas was also referred to gastroenterology specialists at the University of Illinois at Chicago ("UIC"). *Id.*

At some point between October 2016 and December 2018, Thomas told clinicians at UIC that spicy foods made his symptoms worse. *Id.* at ¶ 12; *see also* Ex. D, at ¶ 15 (Dckt. No. 110-2). As you might expect, the medical staff encouraged Thomas to avoid spicy foods. *See* Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 110).

Thomas received treatment from Dr. Henze for the first time on December 11, 2018. *Id.* at ¶ 13. She reviewed the record from his treatment at UIC. *Id.* She told Thomas about potential medical conditions that could have been causing his issues. *Id.*; *see also* Ex. D, at ¶ 19 (Dckt. No. 110-2).

4

Henze took other action, too. She ordered medications for Thomas as recommended by UIC, such as omeprazole. *See* Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 110). She provided Thomas with aloe wipes and toilet paper. *Id.* She issued a permit to allow Thomas to take additional showers. *Id.* She also ordered a bland diet for Thomas without dairy products. *Id.*

Henze hoped that the diet would help Thomas's symptoms and isolate any aggravating foods. *Id.* at ¶ 14. But Henze didn't control what Thomas chose to eat. At the end of the day, it was up to Thomas to follow the diet. *Id.* at ¶¶ 14–15.

Thomas went in a different direction. Thomas continued to eat food that aggravated his medical condition.

Commissary records show that Thomas frequently purchased food that didn't comply with the dietary restrictions. He bought hot sauce, cheese products, sugary foods with added sweeteners, foods with added sodium, and sugary drink mixes and soda. *Id.* at ¶ 16.

Henze requested a follow-up visit at UIC's gastroenterology service. *Id.* at ¶ 18. Wexford approved the request. *Id.* The follow-up visit was originally scheduled for May 20, 2019. *Id.* But the UIC physician wasn't available that day, so it was rescheduled for July 8, 2019. *Id.* at ¶ 20.

In the meantime, Thomas was seen – twice – by another doctor who worked for Wexford. *Id.* at ¶¶ 19, 21. That doctor started Thomas on a tapering prescription of prednisone and reminded him of his prescribed diet. *Id.*

As planned, Thomas received treatment from UIC on July 8. *Id.* at ¶ 22. The doctors recommended an inpatient stay to evaluate a potential diagnosis of microscopic colitis. *Id.*

Dr. Henze saw Thomas for a follow-up visit on July 16, roughly one week later. *Id.* at ¶ 23. She told Thomas that the approval process for the inpatient admission was in progress. *Id.*

She prescribed an SSRI to help with irritable bowel syndrome. *Id.* She also gave Thomas an extension on his daily shower permit. *Id.* Thomas also saw other medical providers at Stateville, too. *Id.* at ¶ 26.

On July 23, 2019, Wexford approved the inpatient stay referral. *Id.* at ¶¶ 24–25. UIC booked an appointment and scheduled a visit for October 7. *Id.* at ¶¶ 24–25. But when October 7 rolled around, UIC did not admit Thomas for inpatient care. *Id.* at ¶ 27. Instead, Thomas had a clinic visit. *Id.*

The UIC physician gave Thomas news that he didn't expect. The UIC doctor reported that Thomas had tested positive for *h. pylori* during a biopsy back in December 2018, seven months earlier. *Id.* at ¶ 28.

Importantly, there is no record that anyone ever communicated the test results to Stateville. *Id.* In particular, there is no evidence that Henze (at Stateville) knew about the positive test results for *h. pylori* in 2018. In fact, she didn't know about the test results until a few days after Thomas learned the test results during the UIC visit on October 7, 2019.

After conveying that news, the UIC doctor made a number of recommendations. *Id.* at ¶ 30. He encouraged Thomas to increase his daily water intake. *Id.* He recommended an assortment of medications, too, including a daily dose of psyllium. *Id.* He advised Thomas to use Imodium as needed to treat his diarrhea. *Id.* He recommended that Thomas start a trial of budesonide, and take prevpac (medication for *h. pylori*). *Id.*

The doctor encouraged additional treatment as well. He told Thomas to get a follow-up *h. pylori* test, and return to the clinic in three months. *Id.*

Two days later, on October 9, 2019, Henze saw Thomas and ordered the medications that the UIC physician had recommended, including medication for *h. pylori*. *Id.* at ¶ 31. She also

submitted a referral for a 3-month follow-up visit at UIC, as UIC has recommended.  *Id.*
Wexford approved the referral on November 13.  *Id.*

Thomas returned to UIC a few months later, and received treatment from February 10 to
12, 2020.  *Id.* at ¶ 32.  His rectal examination showed well-formed stool without blood and good
sphincter tone.  *Id.*

The UIC medical staff discharged Thomas and made a number of dietary
recommendations.  UIC encouraged Thomas to eat less sugar, avoid dairy products, and cut
high-fat food.  UIC also encouraged Thomas to avoid carbonated beverages, fruit juices,
caffeine, alcohol, and stimulants.  *Id.* at ¶ 33.

Less than two weeks later, on February 20, Henze saw Thomas yet again.  *Id.* at ¶ 34.
She ordered additional medication according to UIC's recommendations.  *Id.*  She also submitted
another referral for a follow-up visit three months later.  *Id.*

Wexford approved that referral on March 10, less than a month later.  But then, the
pandemic roared into the country, and lots of things ground to a halt.  The pandemic significantly
delayed the follow-up visit.  *Id.* at ¶¶ 34–35.

Thomas received medical treatment for other ailments during the pandemic.  Physicians
attended to him for upper-respiratory infections, potential COVID-19 infection, and back pain.
*Id.* at ¶ 36.  He also received imaging and treatment, including physical therapy.  *Id.*

On March 29, 2021, almost one year after the scheduled visit, Thomas went back to UIC.
*Id.* at ¶ 37.  Thomas received another round of *h. pylori* treatment.  *Id.* at ¶ 41.  The UIC
physician also noted that Thomas had an elevated stool osmolarity level.  *Id.* at ¶ 37.

A high osmolarity level is indicative of osmotic diarrhea, which can result from eating
foods that draw water into the intestine (like dairy products and foods with added or artificial

sweeteners or sodium). *Id.* at ¶ 38. So, the UIC physician explained to Thomas the different sources of lactose and alternatives to foods with lactose. *Id.* at ¶ 41.

The commissary records from 2021 confirm that Thomas continued to buy food that aggravated his medical condition. He bought food that contained dairy or sweeteners, as well as spicy foods. *Id.* at ¶ 39.

Henze saw Thomas for a follow-up visit on April 6, 2022. *Id.* at ¶ 42. Once again, she ordered the medications recommended by UIC. *Id.* She also educated Thomas on his medications and submitted the paperwork for an anorectal manometry recommended by UIC. *Id.* at ¶ 43. Wexford approved the referral for the procedure. *Id.*

Thomas was supposed to have the anorectal manometry at UIC on April 15, 2022. *Id.* But he vomited on the way to the clinic and reported abdominal pain, so he went to the UIC emergency room instead. *Id.*

Thomas received lab tests and CT scans of his abdomen and pelvis, but they didn't reveal any acute problems. *Id.* So, Thomas was discharged with a prescription of Zofran (anti-nausea medicine), and his anorectal manometry was rescheduled. *Id.*

A couple weeks later, Thomas returned to UIC's gastroenterology service for a follow-up visit. *Id.* at ¶ 44. During that visit, the UIC physician noted that Thomas's issues were "not inflammatory in nature, and instead osmotic, likely relating to something he is ingesting on a regular basis." *Id.* at ¶ 45.

Yet again, the UIC medical staff recommended that Thomas avoid artificial sweeteners, coffee, and dairy. *Id.* at ¶ 46. The staff also told Thomas to keep a log of his dietary intake, so the medical team could review it. *Id.* at ¶¶ 46–47. Thomas never did so.

Thomas returned to UIC for his anorectal manometry on May 11. *Id.* at ¶ 48. The ultrasound showed that his sphincter muscles were intact and that he had normal muscle tone. *Id.* But Thomas seemingly could not squeeze his rectal muscles. *Id.* So, UIC recommended that Thomas engage in pelvic-floor physical therapy. *Id.* at ¶ 50.

Thomas had a follow-up visit with UIC on May 20. *Id.* at ¶ 51. Thomas told the UIC physicians that he had stopped ingesting soda and dairy. *Id.* The physicians again recommended that he avoid fructose, artificial sweeteners, sugar alcohols, coffee, and dairy. *Id.* at ¶ 53. UIC also changed his medications and recommended pelvic-floor therapy. *Id.*

Henze saw Thomas on May 24 for a follow-up visit. *Id.* at ¶ 54. She ordered the medications recommended by UIC. *Id.* She also provided Thomas with a low-bunk/low-gallery permit, daily ice, daily showers, adult diapers, and a recommendation for a vegan diet. *Id.* Finally, she referred Thomas for pelvic-floor physical therapy. *Id.* at ¶ 56. Wexford approved that referral on June 1. *Id.*

Thomas saw UIC's gastroenterology service next on June 17. *Id.* at ¶ 57. Thomas reported some bowel issues relating to a medication trial he was on. *Id.* at ¶ 58. So, the UIC physicians recommended pelvic-floor physical therapy and adding fiber to his diet. *Id.*

Dr. Henze again saw Thomas for a follow-up visit on June 22. *Id.* at ¶ 59. She prescribed a fiber supplement, and reupped her recommendation for a vegan diet. *Id.*

Thomas started physical therapy on August 10. *Id.* at ¶ 61. But Thomas was belligerent and told the physical therapist that he believed that in-house physical therapy would be ineffective. *Id.* The therapist concluded that Thomas had poor rehabilitation potential because of his attitude. *Id.*

9

Thomas returned to UIC's gastroenterology service on August 20. *Id.* at ¶ 62. UIC confirmed that Thomas could not do physical therapy at UIC because he was incarcerated. *Id.* UIC also continued his medications for *h. pylori*, and again recommended that he avoid fructose, artificial sweeteners, dairy, and coffee. *Id.*

On September 1, 2021, Thomas was transferred from Stateville to Pontiac Correctional Center. *Id.* at ¶ 63. After his transfer, Henze and Wexford had no further involvement with Thomas's care. *Id.*

Thomas submitted two grievances to the Illinois Department of Corrections Administrative Review Board. *Id.* at ¶ 73. He submitted his first grievance on October 2, 2019. *Id.* at ¶ 74. And he submitted his second grievance on September 1, 2021. *Id.* at ¶ 77.

Meanwhile, on August 17, 2021, Thomas filed a *pro se* complaint against Wexford and Dr. Henze. He sued other defendants, too, but they have since dropped out of the case. *See* 9/20/22 Order (Dckt. No. 20); 10/2/23 Order (Dckt. No. 65).

Two claims are left in the case. Thomas brings a deliberate-indifference claim against Wexford (Count I) and Dr. Henze (Count III). *Id.* at ¶¶ 14–18, 21–23.

Judge Feinerman originally presided over the case, and appointed Thomas a series of lawyers. After reassignment, this Court appointed Thomas a new lawyer, too. *See* 2/8/23 Order (Dckt. No. 32).

The parties pressed forward with discovery, and things didn't always go smoothly. At one point, the presiding Magistrate Judge sanctioned Thomas for failing to comply with a discovery order. *See* 4/23/24 Order (Dckt. No. 88). At another point, this Court admonished Thomas and his counsel for failing to comply with the Court's process for summary judgment. *See* 11/6/24 Order (Dckt. No. 105). Separately, Defendants filed two motions to dismiss for

10

want of prosecution, which this Court denied without prejudice. *Id.*; *see also* 4/3/25 Order (Dckt. No. 125).

After discovery, Wexford and Dr. Henze moved for summary judgment. *See generally* Mtn. for Summ. J. (Dckt. No. 108).

After the parties fully briefed the motion for summary judgment, counsel for Thomas unfortunately passed away. This Court once again expresses its condolences to her entire family. The passing of his counsel did not affect this Court's consideration of the motion, because it was fully briefed at the time of her passing.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the non-moving party, giving the non-moving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir.

11

2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could

return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v.*

*FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The Eighth Amendment prohibits "cruel and unusual punishments." *See* U.S. Const.

amend. VIII. In the prison context, the Supreme Court has explained that while the Eighth

Amendment "does not mandate comfortable prisons," it does not "permit inhumane ones." *See*

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994). So, "[a] prison official's deliberate indifference

to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828

(cleaned up).

Those constitutional guardrails apply to medical care. "[T]he Eighth Amendment

safeguards the prisoner against a lack of medical care that 'may result in pain and suffering

which no one suggests would serve any penological purpose.'" *See Petties v. Carter*, 836 F.3d

722, 727 (7th Cir. 2016) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

"To determine if the Eighth Amendment has been violated in the prison medical context,

[the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an

objectively serious medical condition, and then determining whether the individual defendant

was deliberately indifferent to that condition." *Id.* at 727–28.

With that standard in mind, this Court will address the claim against Dr. Henze, before

turning to the claim against Wexford.

## I.    Dr. Henze (Count III)

Thomas claims that Dr. Henze showed deliberate indifference to his *h. pylori* condition.

On this record, that claim is a tough sell. Too tough. Whatever you want to call the treatment by

Henze, you can't call it deliberate indifference. If anything, Henze showed deliberate attentiveness, not deliberate indifference.

The parties do not dispute the fact that Thomas suffered from an objectively serious medical condition. So the first element of the claim isn't disputed. The only issue is whether Henze showed deliberate indifference to that legitimate medical need.

In his complaint, Thomas points out how long it took to get treatment for *h. pylori*. His stool started looking different in 2018, and he was later diagnosed with *h. pylori*. *See* Cplt., at ¶ 21 (Dckt. No. 1). Thomas claims that Henze left his *h. pylori* condition untreated for over a year and a half. *Id.* at ¶ 22. Thomas alleges that this delay exacerbated his other injuries, "making the muscles in his anal area weaker" and forcing him to attend physical therapy. *Id.* at ¶ 23.

Thomas seemed to whittle down his claim in response to the motion for summary judgment. Thomas argues that Henze showed deliberate indifference because she didn't see Thomas between November 2019 and February 2020 regarding his *h. pylori* and other gastrointestinal issues. *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 6 (Dckt. No. 123).

"To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind." *See Petties*, 836 F.3d at 728. "[M]ere negligence is not enough." *Id.* (collecting cases).

Deliberate indifference isn't the same thing as medical malpractice. "Even objective recklessness – failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known – is insufficient to make out a claim." *Id.*

A plaintiff must show that "an official *actually* knew of and disregarded a substantial risk of harm." *Id.* (emphasis in original). In other words, a plaintiff must show "evidence that a

13

medical professional knew better than to make the medical decision that he did" to survive summary judgment. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (cleaned up).

When it comes to a medical professional, an action constitutes deliberate indifference when it is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996).

Drawing a line between a difference of opinion and a "substantial departure" can pose a challenge. *See Petties*, 836 F.3d at 729. But Seventh Circuit case law has planted some helpful guideposts.

"One hint of such a departure is when a doctor refuses to take instructions from a specialist." *Id.*; *see also Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999). "Another is when he or she fails to follow an existing protocol." *See Petties*, 836 F.3d at 729. Yet another is "where a prison official persists in a course of treatment known to be ineffective." *Id.* at 730.

"If a prison doctor chooses an 'easier and less efficacious treatment' without exercising professional judgment, such a decision can also constitute deliberate indifference." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 n.10 (1976)). An "inexplicable delay in treatment which serves no penological interest" can constitute deliberate indifference, too. *Id.*

The common thread running through these examples is that "[a] medical professional is entitled to deference in treatment decisions unless '*no* minimally competent professional would have so responded under those circumstances.'" *See Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)).

14

On this record, no reasonable jury could find that Dr. Henze was anywhere in the neighborhood of deliberate indifference. If anything, the record shows that she treated Thomas again and again, and did her level best to treat his medical condition.

To begin, there is no evidence that Henze left his *h. pylori* condition untreated for a year and a half, as Thomas alleged in his complaint. The first indication of *h. pylori* in his medical records appeared in his clinical visit to UIC on October 8, 2019. *See* Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 110); *see also* Ex. A, at 86 (Dckt. No. 111-1).

The UIC physician recommended that Thomas take a prevpac (medication for *h. pylori*) and obtain a follow-up test in 3 months. *See* Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 110); *see also* Ex. A, at 80 (Dckt. No. 111-1). The UIC physician also gave Thomas other recommendations and medications, too. *See* Defs.' Statement of Facts, at ¶ 30.

In response, Henze did exactly what the UIC physician recommended. At her follow-up meeting with Thomas on October 9, 2019 (*i.e.*, the very next day), she ordered the recommended *h. pylori* medications, as well as the other recommended medications. *Id.* at ¶ 31.

In other words, the record shows that Dr. Henze followed the UIC physician's recommendations for treating *h. pylori* within *one day* of Thomas receiving the diagnosis. Nothing in the record suggests that Dr. Henze knew about the *h. pylori* infection sooner.

Thomas also can't bring a claim that Dr. Henze should have known about the *h. pylori* infection sooner. That's the standard for negligence, and negligence isn't unconstitutional. A claim under the Eighth Amendment requires more than medical malpractice.

Thomas trimmed his claim at summary judgment, but it fares no better. Thomas contends that Henze showed deliberate indifference because he received no treatment for the three-month period from November 2019 to the start of February 2020.

15

The record does reveal that Thomas didn't receive treatment during that period. Even so, the record cannot support a finding of deliberate indifference.

The UIC physician saw Thomas on October 8, 2019, and offered recommendations and medications according to his *h. pylori* diagnosis and other symptoms. *Id.* at ¶¶ 28–30. Henze followed the instructions and protocols given by the UIC specialist. Again, she ordered all the recommended medications just *one day* after Thomas's visit with the specialist. *Id.* at ¶ 31.

Thomas can't bring a deliberate indifference claim against Henze based on the fact that he didn't receive treatment for three months. The medical staff recommended a follow-up visit in three months. *Id.* at ¶ 30. And Henze followed that recommendation. *Id.* at ¶ 31.

That delay isn't the kind of "inexplicable delay in treatment" that can "support an inference of deliberate indifference." *See Petties*, 936 F.3d at 730. Henze did not "refuse to take instructions from a specialist," or "fail to follow an existing protocol." *Id.* at 729.

Quite the opposite. Henze followed the UIC specialist's instructions, and she did so promptly. *Compare, e.g.*, *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (reasoning that a two-month delay in supplying readily available over-the-counter pills for gastro-esophageal reflux disease created a question of fact); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (allowing a viable deliberate-indifference claim where a prison doctor delayed scheduling an appointment with a specialist and refused to follow the specialist's advice); *with Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (not allowing a claim based on a six-day delay in treating a mild cyst infection). Simply put, Dr. Henze's behavior doesn't come close to raising a question of fact of deliberate indifference.

True, Thomas didn't receive his follow-up appointment at UIC until four months after his meeting with Henze. But the record confirms that Henze wasn't in charge of scheduling. UIC

16

controlled its own scheduling of patients. *See* Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 110). And his follow-up visit wasn't supposed to be for a few months, anyway. *Id.* at ¶ 30. So, the timing of his follow-up visit doesn't affect whether Henze was deliberately indifferent.

In his brief, Thomas does not devote much attention to his other gastrointestinal issues. In fact, he seems to stake his entire deliberate-indifference claim on the alleged non-treatment of his *h. pylori*. *See* Cplt., at ¶¶ 21–23 (Dckt. No. 1).

The treatment of the other gastrointestinal issues couldn't support a claim, either. The record confirms that Henze promptly treated his other issues, and the record confirms that the treatment was by the book. Henze consistently met with Thomas for follow-up appointments after his specialist meetings, and consistently followed the recommendations from the specialist. *See* Defs.' Statement of Facts, at ¶¶ 31, 34, 42–43, 54, 56, 59 (Dckt. No. 110).

Maybe Thomas was dissatisfied with the treatment that he received. But even if Thomas believes that Henze could have performed better, dissatisfaction with medical care isn't enough to state a constitutional claim. Negligence isn't a basis for a constitutional claim, either. And here, no reasonable jury could return a finding of negligence, let alone deliberate indifference.

## II. Wexford (Count I)

Thomas also argues that Wexford showed deliberate indifference by failing to provide adequate and timely medical care. *See* Cplt., at ¶ 14 (Dckt. No. 1).

As a preliminary note, Thomas brings his claim against Wexford under section 1983, which provides a cause of action against any "person" who violates federal rights while acting under color of state law. *See* 42 U.S.C. § 1983; *see also Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

Thomas *can* sue Wexford as a person. The Supreme Court has held that municipalities are "person[s]" for the purposes of section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). And the Seventh Circuit "treat[s] private corporations acting under color of state law as municipalities." *See Dean*, 18 F.4th at 235.

But under the theory of *Monell* liability, Wexford cannot be vicariously liable for the constitutional torts of its employees or agents. *See Monell*, 436 U.S. at 691–94. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

At times, Thomas asserts that Wexford should be liable based on the "acts and omissions of its authorized agents and employees within the scope of their employment." *See* Cplt., at ¶ 14 (Dckt. No. 1); *see also id.* at ¶ 18. To the extent that Thomas wants to proceed against Wexford on a theory of vicarious liability, *Monell* stands in the way.

The remainder of Thomas's theory against Wexford is that Wexford adopted "widespread practices of cost-cutting" and "delaying or refusing necessary medical care in order to limit the amount spent on treatment for inmates." *Id.* at ¶ 15. The cost cutting allegedly resulted in "reduction in staff, failure to fill critical medical positions or grant off site visits for seriously ill inmates, . . . chaotic recordkeeping, [and] haphazard follow-up care." *Id.* Wexford also allegedly "refuse[d] to renew critical prescription medicines for inmates." *Id.*

In his complaint, Thomas also alleged some general statistics and reports about Wexford. He alleged that 6 of 10 non-violent deaths (presumably of patients cared for by Wexford) are due to lapses in medical care. *Id.* He also alleged that certain facilities under investigation were short-staffed by 35 percent and that medical positions at Stateville were vacant. *Id.* at ¶ 16.

Lastly, he alleged that Wexford staff didn't adequately document patient care, conduct examinations, or provide timely and appropriate treatment. *Id.* at ¶ 17.

To prevail on his *Monell* claim, Thomas first needs to show that "he was deprived of a federal right." *See First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). Then, Morris needs to trace that deprivation to some municipal action (*i.e.*, a policy or custom) that makes the conduct "properly attributable to the municipality itself." *Id.* at 986. For his deliberate-indifference claim, Thomas needs to show that a policy or custom "demonstrates municipal fault." *Id.*; *see also Dean*, 18 F.4th at 235. And then, Thomas needs to show that the policy or custom was "the moving force behind the federal-rights violation." *See Dean*, 18 F.4th at 235 (cleaned up).

Thomas's claim fails at each step. But the Court will discuss only the first two, since those elements (a federal-rights deprivation and a municipal policy) are the *sine qua non* of a *Monell* claim.

First, Thomas presents no evidence that he was deprived of a federal right. In his summary-judgment briefing, he doesn't support a finding of a violation. *See generally* Pl.'s Resp. to Defs.' Mtn. for Summ. J. (Dckt. No. 123). The Eighth Amendment claim can't support a *Monell* claim, because Thomas didn't present evidence to support that claim.

The complaint included some wide-ranging allegations. Thomas alleged that Wexford "fail[ed] to fill critical medical positions or grant off site visits for seriously ill inmates," had "chaotic recordkeeping" and "haphazard follow-up care," and "refuse[d] to renew critical prescription medicines for inmates." *See* Cplt., at ¶ 15 (Dckt. No. 1).

The record does not support any of those allegations. There is no evidence that Wexford failed to fill critical medical positions that affected Thomas. On the contrary, Thomas was

19

consistently seen by Dr. Henze and other medical providers at Stateville.  *See, e.g.*, Defs.'
Statement of Facts, at ¶¶ 13, 19, 21, 23, 26, 31, 34, 36, 42, 43, 54, 56, 59 (Dckt. No. 110).

    Likewise, there is no evidence that Wexford failed to grant off-site visits to Thomas.
Rather, Wexford consistently approved Thomas's off-site visits to UIC's gastroenterology
service for different checkups and procedures.  *See, e.g.*, *id.* at ¶¶ 18, 24, 31, 34, 43.

    True, Thomas couldn't do his pelvic-floor physical therapy at UIC.  *Id.* at ¶ 62.  But the
reason had to do with UIC's restriction, not Wexford's.  *Id.* at ¶ 61 ("UIC would not perform
physical therapy for him."); *see also id.* at ¶ 62 ("UIC's gastroenterology service confirmed Mr.
Thomas was unable to be scheduled for pelvic floor physical therapy at UIC due to his
incarceration.").

    Finally, there is no evidence of chaotic recordkeeping, haphazard follow-up care, or
failure to renew prescription medicines.  If anything, the record supports the opposite conclusion.
*See generally* Ex. A (Dckt. No. 111-1); Ex. D (Dckt. No. 110-2).  Meanwhile, that record shows
that Wexford consistently provided prompt follow-up care to Thomas's UIC visits, which
included ordering the exact medications he was prescribed.  *See, e.g.*, Defs.' Statement of Facts,
at ¶¶ 13, 23, 31, 34, 42, 43, 54, 59 (Dckt. No. 110).

    Second, Thomas presents no evidence of a municipal policy or custom.  Again, the
complaint did allege some general statistics about patient care at Stateville or other prisons that
Wexford provided health care for.  *See* Cplt., at ¶¶ 15–16 (Dckt. No. 1).  But there is no evidence
in the record supporting any of those statistics or trends.

    He also alleged that Wexford staff did not adequately document patient care, conduct
examinations, or provide timely and appropriate treatment.  *Id.* at ¶ 17.  But as this Court already
explained, there is no evidence of those claims.  Again, the detailed records of Thomas's patient

care show that Wexford consistently provided prompt care for Thomas, including referrals to UIC and in-house follow-up visits. *See, e.g.*, Defs.' Statement of Facts, at ¶¶ 13, 18, 19, 21, 23, 24, 26, 31, 34, 36, 42, 43, 54, 56, 59 (Dckt. No. 110).

At bottom, Thomas can't show that a Wexford policy, practice, or custom caused a violation of his federal rights. *See Walker*, 940 F.3d at 966. So he has no claim.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted.

Date: September 24, 2025

_____
Steven C. Seeger
United States District Judge